B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| MARTINEZ QUALITY PAINTING & DRYWALL, INC. | Newco Capital Group VI, Inc. |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| John C. Woodman;   Essex Richards, P.A. 1701 South Boulevard, Charlotte, NC 28203 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☒ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee | ☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor    ☒ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Avoidance Action

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce/sep property settlement/decree
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – reinstatement of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  **$799,250.00** |

Other Relief Sought

B1040 (FORM 1040) (12/15), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR Martinez Quality Painting & Drywall, Inc. | | BANKRUPTCY CASE NO. 22-3357 |
| DISTRICT IN WHICH CASE IS PENDING<br>Western | DIVISIONAL OFFICE<br>Charlotte | NAME OF JUDGE<br>Whitley |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>July 31, 2024 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>John C. Woodman | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, if it is required by the court. In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system. (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.
**Attorneys.** Give the names and addresses of the attorneys, if known.
**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.
**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARTINEZ QUALITY PAINTING & DRYWALL, INC , | ) ) | CASE NO.:  22-30357 CHAPTER 11 |
| | ) | |
| _____Debtor_____ | ) | |
| | ) | |
| MARTINEZ QUALITY PAINTING & DRYWALL, INC., Plaintiff, | ) ) ) | ADVERSARY PROCEEDING NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| NEWCO CAPITAL GROUP VI, LLC, Defendant. | ) ) | |
| | ) | |
| _____ | ) | |

## COMPLAINT

Now comes MARTINEZ QUALITY PAINTING & DRYWALL, INC. (the "Plaintiff" or "Debtor"), by and through counsel, and complains of Defendant NewCo Capital Group VI, LLC as follows:

### PRELIMINARY STATEMENT

This adversary proceeding seeks to avoid and recover at least $799,250.00 in transfers to a merchant cash advance ("MCA") lender – NewCo Capital Group VI, LLC ("Defendant") -- who loaned money to the Debtor before the Petition Date.  Despite Defendant's attempt to classify the arrangement as the purchase of future receivables, the facts clearly establish that it was a financing agreement.  Moreover, it was a financing agreement with an exorbitant rate of interest and outside the ordinary course of Debtor's business.  As provided for herein, Defendant's sweep of the Debtor's bank account resulted in Defendant's receipt of funds absent any reasonable equivalent value given to the Debtor.   These transfers constitute preferential and avoidable transfers under the Bankruptcy Code.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, Martinez Quality Painting & Drywall, Inc. is the debtor in the bankruptcy case bearing Case Number 22-30357 ("Bankruptcy Case"), filed on August 1, 2022 ("Petition Date"), before the United States Bankruptcy Court for the Western District of North Carolina ("Court").

2.      Upon information and belief, Defendant is a limited liability company incorporated in the State of Delaware with a principal office in New York, New York.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334.

4.      This matter is a core proceeding pursuant to 28 U.S.C. § 157.

5.      Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409(a).

6.      The statutory predicates for relief are 11 U.S.C. §§ 105, 363, 544, 547, 548, and 550, as well as N.C. Gen. Stat. § 39-23.1 *et seq.* and 28 U.S.C. § 3304 *et seq.*

7.      Plaintiff commences this action under Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND

8.      Formed on February 24, 2017, the Debtor operated a commercial drywall and painting contractor completing projects in the southeast United States.

9.      The Debtor filed its *Plan of Reorganization Pursuant to § 1190 of the Bankruptcy Code* dated October 28, 2022 (the "Original Plan") [ECF No. 90] which was as amended by that certain *Amended Plan of Reorganization Pursuant to § 1190 of the Bankruptcy Code* dated December 14, 2022 [ECF No. 141, 158] (the "Amended Plan").

10.     On January 5, 2023, the Bankruptcy Court entered its *Order Confirming Chapter Amended 11 Plan* (the "Order") confirming the Amended Plan.

*MCA Agreement 1*

11.     On July 23, 2021, the Debtor entered into a *Revenue Purchase Agreement* ("MCA Agreement No. 1") with Defendant.

12.     Attached hereto as <u>Exhibit A</u> is a true and accurate copy of the MCA Agreement No. 1 which is incorporated by reference as if fully set forth herein.

13.     The MCA Agreement No. 1 provides for a "Purchase Price" of $250,000.00 on "Receivables Purchased" of $347,500.00.

14.     The MCA Agreement No. 1 also includes additional fees to be paid by the Debtor, including underwriting and related expenses.

15.     The MCA Agreement No. 1purportedly allowed Defendant to withdraw an amount of $2,483.00 daily from Debtor's bank account at Fidelity Bank, account ending in 4669 (the "Bank Account") until Defendant recovered the full amount of the Receipts Purchased plus fees.

16.     In total, upon information and belief, Defendant received at least $347,500.00 from the Bank Account ("Transfer on MCA Agreement 1") concerning the MCA Agreement No. 1.

17.     Upon information and belief, to effectuate this, Defendant required the Debtor to execute an ACH Authorization as part of the MCA Agreement No. 1.

18.     As part of the MCA Agreement No. 1, the Debtor's insider also executed a personal guaranty.

19.     The MCA Agreement No. 1 purports to purchase 15.0% of Debtor's Receivables, but Defendant put no procedures in place to limit its weekly sweep of the Debtor's Bank Account to actual Receivables.

***MCA Agreement 2***

20.     On November 4, 2021, the Debtor entered into a Revenue Purchase Agreement ("MCA Agreement No. 2" and together with MCA Agreement No. 1, the "MCA Agreements") with Defendant.

21.     Attached hereto as Exhibit B is a true and accurate copy of the MCA Agreement No. 2 is which is incorporated by reference as if fully set forth herein.

22.     The MCA Agreement No. 2 provides for a "Purchase Price" of $325,000.00 on "Receivables Purchased" of $451,750.00.

23.     The MCA Agreement No. 2 also includes additional fees to be paid by the Debtor, including underwriting and related expenses.

24.     The MCA Agreement No. 2purportedly allowed Defendant to withdraw an amount of $3,226.00 daily from Debtor's Bank Account until Defendant recovered the full amount of the Receipts Purchased plus fees.

25.     In total, Defendant withdrew at least $451,750.00 from the Bank Account ("Transfer on MCA Agreement 2") concerning the MCA Agreement No. 2.

26.     Upon information and belief, to effectuate this, Defendant required the Debtor to execute an ACH Authorization as part of the MCA Agreement No. 2.

27.     As part of the MCA Agreement No. 2, the Debtor's insider also executed a personal guaranty.

28.     The MCA Agreement No. 2 purports to purchase 15.0% of Debtor's Receivables, but Defendant put no procedures in place to limit its weekly sweep of the Debtor's Bank Account to actual Receivables.

29.     Upon information and belief, the aggregate amount received by the Defendant in the amount of $799,250.00 over from the date of the MCA Agreements through the last payment made on April 13, 2022.

30.     Therefore, in total, upon information and belief, Defendant withdrew at least $799,250.00 from the Bank Account ("Transfers").

31.     Upon information and belief, to effectuate this, Defendant required the Debtor to execute an ACH Authorization as part of the MCA Agreements.

32.     As part of the MCA Agreements, the Debtor's insider also executed a personal guaranty.

33.     Shortly thereafter, Defendant began to withdraw funds from the Bank Account.

34.     Upon information and belief, the Defendant received significantly more than the funded amount.

35.     The amount and source of the Transfers bear little relationship to the repayment terms of the MCA Agreements, which by its terms was limited to a portion of Debtor's purported Receivables.

36.     This information was readily available to Defendant.

37.     This information would have been obvious to Defendant if they reviewed Debtor's bank statements or books and records.

38.     Upon information and belief, Defendant failed to complete an accounting or due diligence or take steps to verify that the funds it swept were Receivables under the MCA Agreements.

39.     The alleged loan from Defendant was paid from payments to which Defendant had no right under its own contract documents.

40.     Defendant intentionally disregarded the reality of Debtor's finances because to do otherwise would have impaired its ability to recoup the funds it loaned to Debtor.

41.     Defendant knew, or in the exercise of reasonable due diligence, should have known that the Debtor was in financial distress.

42.     Defendant was a Net Winner as that term was defined under the Confirmed Plan.

43.     A Net Winner was an MCA entity that received more than the amount it provided to the Debtor.

44.     In summary, Defendant received more than it was entitled to receive and the Court should avoid the transfers permitting the Debtor to be allowed to recover them for the creditors of the bankruptcy estate.

45.     The withdrawals under the MCA Agreements were based on an exorbitantly high interest rate.

46.     The terms of the MCA Agreements represented a deviation from the normal commercial financial transactions and loan terms.

47.     The terms of the MCA Agreements represented a deviation from the Debtor's normal financial transactions and loan terms.

48.     When the Debtor entered into the MCA Agreements, it was unable to pay its debts as they became due.

49.     Even with the loan from the Defendant, the Debtor was unable to pay its debts as they came due.

57.     Defendant bore no risk of loss under the MCA Agreements, making it in fact a loan to the Debtor and not an outright sale of assets.

58.     The MCA Agreements purports to purchase 15% of Debtor's Receivables, but Defendant put no procedures in place to limit its weekly sweep of the Debtor's Bank Account to actual Receivables.

59.     Upon information and belief, Defendant conducted no investigation of Debtor's supposed account debtors.

60.     This did not matter to Defendant, as it simply swept money from the Bank Account, regardless of the source, as repayment for its disguised loan.

61.     The cumulative effect of the terms of the MCA Agreements, and how it actually worked, is that Defendant bore little to no risk of loss under the MCA Agreements and had significant recourse rights against Debtor, and its principal.

62.     Contrary to the contract language, the MCA Agreements was in fact a disguised loan.

63.     The MCA Agreements are a loan governed by New York law.

64.     The MCA Agreements are charged the Debtor an approximate annual rate of interest of 40%.

65.     Under New York law, the charging of interest in excess of 25.00% per annum is criminally usurious. N.Y. Penal Law § 190.40.

66.     According to N.Y. Gen. Oblig. Law § 5-511 ("Usurious Contracts Void"), a contract that charges interest in excess of that prescribed by New York law is void *ab initio*.

67.     Under New York law, when a transaction is deemed void *ab initio* for violating the usury laws, recovery of both principal and interest is prohibited.

## FIRST CLAIM FOR RELIEF

### Avoidance of Constructively Fraudulent Transfers –
### 11 U.S.C. § 548(a)(1)(B)

68.     Plaintiff realleges all prior paragraphs of this complaint and incorporates them as if fully set forth herein.

69.     During the two years before the Petition Date, the Debtor made to the Defendant the Transfers totaling $799,250.00 from the Bank Account.

70.     The Transfers took the form of affirmative sweeps of Debtor's Bank Account by Defendant.

71.     The Transfers constituted a transfer of an interest of the Debtor in property through the sweeping of the Debtor's bank account.

72.     The Transfers were made for the benefit of the Debtor.

73.     The Transfers were made within two years of the Petition Date.

74.     The Transfers presumably were made in connection with the MCA Agreements.

75.     The MCA Agreements are void *ab initio* under New York law.

76.     Because the MCA Agreements are void *ab initio,* all the Transfers are void and avoidable.

77.     Because the MCA Agreements are void, all Transfers made under it were not made

for reasonably equivalent value.

78.     The Debtor did not receive reasonably equivalent value in exchange for the Transfers.

79.     On the date each of the Transfers was made, the Debtor: (a) was insolvent or became insolvent as a result of each Transfer, (b) was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the Debtor was unreasonably small in relation to the Debtor's outstanding liabilities, or (c) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

80.     For these reasons, the Transfers are avoidable as constructively fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1)(B), and Plaintiff is entitled to avoid the Transfers for the benefit of the estate.

**SECOND CLAIM FOR RELIEF**
**Avoidance of Constructively Fraudulent Transfers –**
**N.C. Gen. Stat. § 39-23.1 *et seq.***

81.     Plaintiff realleges all prior paragraphs of this complaint and incorporates them as if fully set forth herein.

82.     During the two years before the Petition Date, the Debtor made to the Defendant the Transfers totaling $799,250.00 from the Bank Account.

83.     The Transfers took the form of affirmative sweeps of the Debtor's Bank Account by Defendant.

84.     The Transfers constituted a transfer of an interest of the Debtor in property through the sweeping of the Debtor's bank account.

85.     The Transfers were made for the benefit of the Debtor.

86.     The Transfers were made within four years of the Petition Date.

87.     The Debtor has unsecured creditors that could avoid the Transfers.

88.     The Transfers presumably were made in connection with the MCA Agreements.

89.     If the Court determines that the MCA Agreements are valid, the Transfers are nevertheless avoidable because they were not made for reasonably equivalent value.

90.     The Transfers violated the terms of the MCA Agreements.

91.    The Transfers were not of a portion of the Debtor's Receivables as required by the MCA Agreements.

92.    The Transfers exceeded the 15% of Receivables capped by the MCA Agreements.

93.    On the date each of the Transfers was made, the Debtor: (a) was insolvent or became insolvent as a result of each Transfer, (b) was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the Debtor was unreasonably small in relation to the Debtor's outstanding liabilities, or (c) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

94.    For these reasons, the Transfers are avoidable as constructively fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1)(B), and Plaintiff is entitled to avoid the Transfers for the benefit of the estate.

## THIRD CLAIM FOR RELIEF
### Obligations Incurred Under the MCA Agreements – 11 U.S.C. § 548(a)(1)(B)

95.    Plaintiff realleges all prior paragraphs of this complaint and incorporates them as if fully set forth herein.

96.    During the two years before the Petition Date the Debtor incurred obligations under the MCA Agreements, including authorizing Defendant to withdraw a daily amount of $3,266.00 weekly from Debtor's Bank Account until Defendant recovered the full amount of the Receipts Purchased plus fees.

97.    The obligations represented by the MCA Agreements are void *ab initio* under New York law for the reasons set forth above.

98.    Because the MCA Agreements are void *ab initio,* all obligations under it are void and avoidable.

99.    As a matter of law, because the obligations under the MCA Agreements are void, all transfers made under the MCA Agreements were not made for reasonably equivalent value.

100.    On the date the Debtor entered into the MCA Agreements, the Debtor: (a) was insolvent or became insolvent as a result of each Transfer, (b) was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining

with the Debtor was unreasonably small in relation to the Debtor's outstanding liabilities, or (c) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

101.    For these reasons, the obligations incurred under the MCA Agreements should be avoided in their entirety under 11 U.S.C. § 548(a)(1)(B) for the benefit of the estate.

**FOURTH CLAIM FOR RELIEF**
**Avoidance of Fraudulent Transfers - 11 USC § 548(a)(1)(A) Actual Fraud**

102.    Plaintiff realleges all prior paragraphs of this complaint and incorporates them as if fully set forth herein.

103.    The Transfers represent transfers of property of the Debtor to the Defendant.

104.    The Transfers were made while the Debtor was insolvent.

105.    The Transfers were made with the intent to hinder, delay, or defraud a creditor or of the Debtor.

106.    The following badges of fraud are applicable to the Transfers: (i) Debtor was insolvent when it made the Transfers to the Defendants; (ii) at the time of the Transfers, the Debtor was unable to pay its debts as they came due; (iii) at the time of the Transfers, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; (iv) Debtor did not receive reasonably equivalent value in exchange for the Transfers; and (v) Debtor made the Transfers during the same time it was divesting itself of other assets and entering into other MCA loans.

107.    The Transfers were distributions made pursuant to the void MCA Agreements.

108.    For these reasons asserted herein, the Transfers should be avoided.

109.    Plaintiff also is entitled to a judgment against Defendant as the initial transferee in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Recovery of Transfers under 11 U.S.C. § 550**

110.    Plaintiff realleges all prior paragraphs of this complaint and incorporates them as if fully set forth herein.

111.   The Transfers are avoidable pursuant to 11 U.S.C. §§ 547 and 548.

112.   Defendant was the initial transferee of the Transfers.

113.   As a result, Plaintiff is entitled to recover the Transfers or the value of the Transfers from Defendant under Section 550.

## SIXTH CLAIM FOR RELIEF
### Reconciliation and Accounting / Turnover of Property of Estate under 11 U.S.C. § 542

114.   Plaintiff realleges all prior paragraphs of this complaint and incorporates them as if fully set forth herein.

115.   During the two years before the Petition Date, the Debtor made to the Defendant the Transfers totaling $799,250.00 from the Bank Account.

116.   The Transfers presumably were made in connection with the MCA Agreements.

117.   If the Court determines that the MCA Agreements are valid, then the Trustee is entitled to receive and request that the Defendant conduct a reconciliation in order to ensure that the amount of Transfers collected by Defendant equals the amount under the MCA Agreements.

118.   If the Transfers exceed the Debtor's Receivables under the MCA Agreements, then the excess payments constitute property of the estate or the value of property of the estate in the possession, control, and custody of Defendant.

119.   The excess payments held and/or received by Defendant are estate property the Debtor may use to preform under its Confirmed Plan.

120.   Plaintiff is entitled to an accounting and reconciliation under the MCA Agreements and a judgment that the excess payments are property of the Debtor's estate and that Defendant must account for and turn over and deliver the excess payments or their value to the Debtor.

**WHEREFORE**, Plaintiff prays that:

A.     The Court avoid the Transfers as constructively fraudulent or actually fraudulent transfers;

B.     The Court avoid the incurrence of the obligations under the MCA Agreements;

C.     Plaintiff recover the value of the Transfers and the Preference Period Transfers from the Defendant;

D.     The Court compel Defendant to provide an accounting and reconciliation under the MCA Agreements;

E.     The Court enter judgment that the excess payments are property of the Debtor's estate and that Defendant must account for and turn over and deliver the excess payments or their value to the Trustee.

F.     The Court enter judgment awarding damages to Plaintiff in an amount to be proven at trial; and

G.     The Court grant the Plaintiff such other and further relief as the Court deems just and proper.

Charlotte, North Carolina
This the 31ST day of July, 2024.

**ESSEX RICHARDS, P.A.**

*/s/ John C. Woodman*
John C. Woodman (NC Bar No. 42365)
1701 South Boulevard
Charlotte, North Carolina 28203
Tel: (704) 377-4300
Fax:  (704) 372-1357
E-mail: jwoodman@essexrichards.com
*Counsel for the Debtor*

11

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0





# NewCo.
## CAPITAL GROUP

# REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement")
dated ___July 23, 2021___ between NewCo Capital Group VI LLC ("NCG") the Merchant(s) listed below
("Merchant") and the Individual(s) listed below ("Guarantor")

## MERCHANT INFORMATION

Merchant's Legal name
**MARTINEZ QUALITY PAINTING & DRYWALL INC**

MARTINEZ  QUALITY PAINTING & DRYWALL INC. / MARTINEZ QUALITY PAINTING AND DRYWALL INC / MQPND / ANTOJOS LOCOS LLC

Type of Entity
☑ Corp.  ☐ LLC  ☐ Sole Prop  ☐ Other

State of Incorporation / Organization
**NC**

D/B/A
**MARTINEZ QUALITY PAINTING & DRYWALL**

Physical Address
**8605 MULBERRY GROVE RD**

| City | State | Zip | Business Phone |
|---|---|---|---|
| CHARLOTTE | NC | 28227 | 980-234-1553 |

| Guarantor(s) Name | Cellphone Number | Email Address |
|---|---|---|
| RICARDO MARTINEZ LARA | 704-340-1577 | MARTINEZQUALITYPAINTNDRYWALL@GMAIL.COM |

Mailing Address
**6500 TEANECK PLACE**

| City | State | Zip |
|---|---|---|
| CHARLOTTE | NC | 28215 |

| Purchase Price | Purchased Percent | Purchased Amount | Payment Frequency | Remittance |
|---|---|---|---|---|
| $ 250,000.00 | 15 % | $ 347,500.00 | DAILY | $ 2,483.00 |

In consideration of payment by NCG to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and
transfers to NCG (making NCG the absolute owner) the Purchased Percentage of all of the Merchant's payments, receipts,
settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in
payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card
transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers'
and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement,
electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/
or services (the "Transactions") until the Purchased Amount has been deliver[...] [...]t to NCG.

**EXHIBIT**

A

1

Initial [signature]

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0

NewCo.
CAPITAL GROUP

Merchant is selling a portion of a future revenue stream to NCG at a discount, and is not borrowing money from NCG, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by NCG. The Remittance is a good faith estimate of NCG's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. NCG is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and NCG assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give NCG a reasonable and fair opportunity to receive the benefit of its bargain. NCG acknowledges that it may never receive the Purchased Amount in the event that the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph1.5.

NCG will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, NCG (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as NCG receives payment in full of the Purchased Amount. Merchant hereby authorizes NCG to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of NCG) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide NCG with all required access codes and monthly bank statements regarding the Account so that NCG may monitor the Account. NCG payment of the Purchase Price shall be deemed the acceptance and performance by NCG of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by NCG remains in the Account and will be held responsible for any fees incurred by NCG resulting from a rejected ACH attempt or an Event of Default. NCG is not responsible for any overdrafts or rejected transactions that may result from NCG's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between NCG and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1) By:**
RICARDO MARTINEZ LARA
Print Name and Title

DocuSigned by:
*Ricardo Martinez Lara*
5F69F574A5234DF...
Signature

**FOR THE MERCHANT (#2) By:**

Print Name and Title

Signature

**BY GUARANTOR(S) (#1) By:**
RICARDO MARTINEZ LARA
Print Name and Title

DocuSigned by:
*Ricardo Martinez Lara*
5F69F574A5234DF...
Signature

**BY GUARANTOR(S) (#2) By:**

Print Name and Title

Signature

Initial

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0

NewCo.
CAPITAL GROUP

# MERCHANT AGREEMENT TERMS AND CONDITIONS

## 1   TERMS OF ENROLLMENT IN PROGRAM

**1.1   Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to NCG with a Bank acceptable to NCG to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to NCG with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide NCG and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes NCG and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to NCG for the receipts as specified herein and to pay such amounts to NCG. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by NCG or not. This additional authorization is not a waiver of NCG's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which NCG did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of NCG.
**1.2   Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by NCG as he terms of this Agreement.
**1.3   Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@NewCoCapitalGroup.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. NCG retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and NCG shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by NCG within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by NCG shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with NCG's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.
**1.4   Adjustments to the Remittance.** As long as Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to NCG to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@NewCoCapitalGroup.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. NCG retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and NCG shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide NCG with viewing access to their bank account as well as all information reasonably requested by NCG to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.
**1.5   Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize NCG and its agents to investigate their financial responsibility and history, and will provide to NCG any authorizations, bank or financial statements, tax returns, etc., as NCG requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. NCG is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.
**1.6   Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide NCG with Merchant's banking, brokerage and/ or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide NCG with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from NCG.
**1.7   Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless NCG and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnity as a direct or indirect result of (a) claims asserted by NCG for monies owed to NCG from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by NCG.
**1.8   No Liability.** In no event will NCG be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s) s will be jointly liable for all of NCG's attorney's fees and expenses resulting therefrom.
**1.9   Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, NCG, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.
**1.10   Sale of Receipts.** Merchant and NCG agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from NCG to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. NCG has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that NCG's share of Receipts collected are being held by Merchant in trust and are the sole property of NCG until they are remitted to NCG. Payments made to NCG in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to NCG full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. NCG hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of NCG for the purpose of collecting and delivering Receipts to NCG as required by this Agreement until NCG has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to NCG under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that NCG is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that NCG has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and NCG shall promptly refund to Merchant any interest received by NCG in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that NCG not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.
**1.11   Power of Attorney.** Merchant irrevocably appoints NCG and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to NCG from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any

Initial

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0

NewCo.
CAPITAL GROUP

invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to NCG; and (v) to contact Guarantor(s)'s banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which NCG may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection there with all costs, expenses and fees, including legal fees, shall be payable by merchant.

**1.12 Protections against Default.** The following Protections 1 through 8 may be invoked by NCG immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the NCG electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to NCG; (c)Merchant changes the electronic check process or through which the Receipts are settled from Process or to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of NCG, and (ii) the written agreement of any NCG or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to NCG; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide NCG with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from NCG, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to NCG at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** NCG may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes NCG to execute in the name of the Merchant a Confession of Judgment in favor of NCG pursuant to the terms of the Confession of Judgment. Upon an Event of Default, NCG may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** NCG may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** NCG may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** NCG may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if NCG recovers a Judgment against Merchant, Merchant shall be liable for all of NCG's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to NCG. Upon breach of any provision in this Agreement, NCG may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. NCG may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account or otherwise for all sums due to NCG.

**Protection 8.** NCG may debit Merchant's depository accounts wherever situated in such amounts as determined by NCG in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to NCG by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account or otherwise for all sums due to NCG.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of him self for herself personally, authorizes NCG to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that NCG obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each

Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against NCG or any of its affiliates relating to any (i)investigation undertaken by or on behalf of NCG as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by NCG, including this Agreement and any other NCG documents (collectively, "Confidential Information") are proprietary and confidential information of NCG. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of NCG to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles NCG to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s here to all hereby authorizes NCG to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that NCG may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between NCG and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## 2   REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to NCG, and future statements which will be furnished hereafter at the discretion of NCG, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise NCG of any material adverse change in their financial condition, operation or ownership. NCG may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to NCG within five business days after request from NCG. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without NCG's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and NCG, nor shall Merchant change any of its places of business without prior written consent by NCG.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from NCG to Merchant, execute, acknowledge and deliver to NCG and/or to any other person, firm or corporation specified by NCG, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications,that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion there of has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which NCG has been granted a security interest under the Security

Initial

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0

NewCo. CAPITAL GROUP

Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of NCG or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of NCG.

**2.11 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering in to this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13 Good Faith.** Merchant and Guarantor(s) hereby affirm that Merchant is receiving the Purchase Price and selling NCG the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

## 3   EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor(s) shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant or verbally notifying NCG of its intent to breach this Agreement; (d) the Merchant fails to give NCG 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account; (e) Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by NCG, (f) Merchant shall voluntarily transfer or sell all or substantially all of its assets; (g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (h) Merchant shall use multiple depository accounts without the prior written consent of NCG or takes any other action that intentionally interferes with or prevents NCG from receiving the Purchased Amount in accordance with the terms of this Agreement; (i) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party. (j) Merchant shall change its depositing account without the prior written consent of NCG; or (k) Merchant shall close its depositing account used for ACH debits without the prior written consent of NCG (l) Merchant's bank returns a code other than NSF cutting NCG from its collections (m) Merchant or any Owner/ Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant; (n) Merchant shall default under any of the terms, covenants and conditions of any other agreement with NCG.

**3.2 Limited Personal Guaranty** Upon the occurrence of an Event of Default, NCG will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will be jointly and severally liable to NCG for all of NCG's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3 Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, NCG may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of NCG in connection with this Agreement may be exercised at any time by NCG after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Attorney's Fees.** Upon the occurrence of an Event of Default, and NCG retains an attorney or law firm to enforce this Agreement, and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

**3.5 Costs.** Merchant shall pay to NCG all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of NCG's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.6 Required Notifications.** Merchant is required to give NCG written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give NCG seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## 4   MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by NCG.

**4.2 Assignment.** NCG may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to NCG shall become effective only upon receipt by NCG. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of NCG to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and NCG and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of NCG which consent may be withheld in NCG's sole discretion. NCG reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if NCG so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by NCG to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by NCG by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement,or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforce ability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty here to embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and NCG and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10 JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

Initial 

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0

NewCo.
CAPITAL GROUP

IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER.** THE PARTIES HEREBY WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.12 Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

### SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name  MARTINEZ QUALITY PAINTING & DRYWALL INC

D/B/A: MARTINEZ QUALITY PAINTING & DRYWALL    Federal ID# 81-5464716

Physical Address  8605 MULBERRY GROVE RD

City CHARLOTTE           State NC      Zip 28227

### SECURITY AGREEMENT
**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to NCG and NCG's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements here in, Merchant and Guarantor(s) (s) grants to NCG a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) (s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to NCG under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to NCG upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover NCG's entitlements under this Agreement, NCG is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of NCG's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, NCG or an affiliate of NCG is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.
In the event Merchant, any of its officers or directors or any Owner/ Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to NCG for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due NCG under the Revenue Purchase Agreement. With respect to any such entity, NCG shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. NCG shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such

Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. NCG shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of NCG's rights, including without limitation, NCG's right to collect all accounts, and to notify any payment card processor or creditor of such entity that NCG has such rights in such entity's assets. Merchant also agrees that, at the NCG's discretion, NCG may choose to amend any existing financing statement to include any such newly formed entity as debtor.
This security interest may be exercised by NCG without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. NCG shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, NCG has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, NCG will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from NCG written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and NCG is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by NCG. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to NCG such instruments and documents NCG may reasonably request to perfect and confirm the lien, security interest and right of set off set forth in this Agreement. NCG is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s)name.
Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to NCG under any other agreement between Merchant or Guarantor(s)(s) and NCG (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as NCG deems necessary to perfect or maintain NCG's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes NCG to file any financing statements deemed necessary by NCG to perfect or maintain NCG's security interest. Merchant and Guarantor(s)(s) shall be liable for, and NCG may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by NCG in protecting, preserving and enforcing NCG's security interest and rights.
**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.
**Consent to Enter Premises and Assign Lease.** NCG shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, NCG may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that NCG may enter into an agreement with Merchant's landlord giving NCG the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.
**Remedies.** Upon any Event of Default, NCG may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to NCG, whether by acceleration or otherwise.

### GUARANTY OF PERFORMANCE

As an additional inducement for NCG to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides NCG with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to NCG in the Event of Default. Guarantor(s) (s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

Initial

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0



**Guarantor(s) Waivers.** In the event of a breach of the above, NCG may seek recovery from Guarantor(s)s for all of NCG's losses and damages by enforcement of NCG's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral NCG may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in The Security Agreement and Guaranty herein. NCG is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) NCG's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to NCG. In addition, NCG may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to NCG; (ii) release Merchant from its obligations to NCG; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to NCG under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that NCG must return any amount paid by Merchant or any other Guarantor(s) of

the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

**Guarantor(s) Acknowledgment.** Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if NCG so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by NCG to transfer such proceeding to an Acceptable Forum.

The Merchant and Guarantor Acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their rights to Service of Porcess by traditional manners and will accept process of any Summons and Complaint or other legal process by certifies mail return receipt requested to the Mailing Address on Page 1 of the Agreement.

## MERCHANT(S)

**FOR ALL MERCHANT(S) (#1) By:**

RICARDO MARTINEZ LARA
Print Name and Title

1779
SSN#

DocuSigned by:
*Ricardo Martinez Lara*
5F69F574A5234DF...
Signature

**FOR ALL MERCHANT(S) (#2) By:**

Print Name and Title

SSN#

Signature

## GUARANTOR(S)

**GUARANTOR(S) (#1) By:**

RICARDO MARTINEZ LARA
Print Name and Title

1779
SSN#

DocuSigned by:
*Ricardo Martinez Lara*
5F69F574A5234DF...
Signature

**GUARANTOR(S) (#2) By:**

Print Name and Title

SSN#

Signature

Initial 

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0





# APPENDIX A - THE FEE STRUCTURE:

A. Underwriting Fee $ 0.00     to cover the underwriting and related expenses.

B. Origination Fee $ 6,999.00     to cover the cost of Origination and ACH Setup.

C. NSF Fee (standard) $35.00 (each)

D. Rejected ACH/Blocked ACH/Default Fee $2,500.00 when Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our Debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

E Bank Change Fee $50.00 When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system

F. Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

FOR THE MERCHANT (#1) By:

RICARDO MARTINEZ LARA
Print Name and Title

FOR ALL MERCHANT (#2) By:

Print Name and Title

DocuSigned by:

*Ricardo Martinez Lara*

5F69F574A5234DF...

Signature

Signature

Initial

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0





# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**Merchant:** MARTINEZ QUALITY PAINTING & DRYWALL INC

(Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement between NCG and Merchant, dated as of

July 23, 2021

(Month) (Day) (Year)

Designated Checking Account:

**Bank Name:** FIDELITY BANK                        **Branch:**

**Tax ID:** 81-5464716

**ABA: Routing:** 3585                **DDA: Account:** 4669

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes NCG to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes NCG to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of: $ 2,483.00          (Or) Percentage of each Banking Deposit:15 % On the Following Day(s):

☑ Monday   ☑ Tuesday   ☑ Wednesday   ☑ Thursday   ☑ Friday

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that NCG may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes NCG to initiate ACH entries to correct any erroneous payment transaction. Merchant also authorizes NCG or its affiliates and servicer to collect amounts due.

**MISCELLANEOUS.** NCG is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until NCG has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford NCG a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Merchant**                                                    **Date**

MARTINEZ QUALITY PAINTING & DRYWALL INC                July 23, 2021

(Merchant's Legal Name)                                (Month) (Day) (Year)

**Owner**

Title

RICARDO MARTINEZ LARA

Print Name

DocuSigned by:

*Ricardo Martinez Lara*

5F69F574A5234DF...

(Signature)

9

Initial

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

DocuSign Envelope ID: DD1A8C6D-35B0-477C-B73B-B5A9BD2D4FE0



# NewCo.
CAPITAL GROUP

## BANK LOGIN INFORMATION

Dear Merchant,

Thank you for accepting this offer from NewCo Capital Group VI LLC. We look forward to being your funding partner for as long as you need.

Daily ACH Program:

Funder will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

## * Be sure to indicate capital or lower case letters.

**Name of Bank**

**Username**

**Bank portal website**

**Password**

**Security Question 1**

→ **Security Answer 1**

**Security Question 2**

→ **Security Answer 2**

**Security Question 3**

→ **Security Answer 3**

**Any other information necessary to access your account:**

**MERCHANT/OWNER NAME**

RICARDO MARTINEZ LARA
Print Name and Title

**Date**

July 23, 2021
(Month) (Day) (Year)

DocuSigned by:

*Ricardo Martinez Lara*

5F69F574A5234DF...

Signature

10

Initial

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850



# NewCo.
## CAPITAL GROUP

# REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated **November 4, 2021** between NewCo Capital Group VI LLC ("NCG") the Merchant(s) listed below ("Merchant") and the Individual(s) listed below ("Guarantor")

## MERCHANT INFORMATION

Merchant's Legal name
**MARTINEZ QUALITY PAINTING & DRYWALL INC**

**MARTINEZ  QUALITY PAINTING & DRYWALL INC. / MARTINEZ QUALITY PAINTING AND DRYWALL INC / MQPND / ANTOJOS LOCOS LLC**

| Type of Entity | State of Incorporation / Organization |
|---|---|
| ☒ Corp.  ☐ LLC  ☐ Sole Prop  ☐ Other | NC |

D/B/A
**MARTINEZ QUALITY PAINTING & DRYWALL**

Physical Address
**8605 MULBERRY GROVE RD**

| City | State | Zip | Business Phone |
|---|---|---|---|
| CHARLOTTE | NC | 28227 | 980-234-1553 |

| Guarantor(s) Name | Cellphone Number | Email Address |
|---|---|---|
| RICARDO MARTINEZ LARA | 704-340-1577 | MARTINEZQUALITYPAINTNDRYWALL@GMAIL.COM |

Mailing Address
**6500 TEANECK PLACE**

| City | State | Zip |
|---|---|---|
| CHARLOTTE | NC | 28215 |

| Purchase Price | Purchased Percent | Purchased Amount | Payment Frequency | Remittance |
|---|---|---|---|---|
| $ 325,000.00 | 15 % | $ 451,750.00 | DAILY | $ 3,226.00 |

In consideration of payment by NCG to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to NCG (making NCG the absolute owner) the Purchased Percentage of all of the Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment, for the payments to Merchant as a result of Merchant's sale of goods and/ or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to NCG.



**EXHIBIT**

Initial 

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850



Merchant is selling a portion of a future revenue stream to NCG at a discount, and is not borrowing money from NCG, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by NCG. The Remittance is a good faith estimate of NCG's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. NCG is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and NCG assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give NCG a reasonable and fair opportunity to receive the benefit of its bargain. NCG acknowledges that it may never receive the Purchased Amount in the event that the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph1.5.

NCG will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, NCG (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as NCG receives payment in full of the Purchased Amount. Merchant hereby authorizes NCG to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of NCG) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide NCG with all required access codes and monthly bank statements regarding the Account so that NCG may monitor the Account. NCG payment of the Purchase Price shall be deemed the acceptance and performance by NCG of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by NCG remains in the Account and will be held responsible for any fees incurred by NCG resulting from a rejected ACH attempt or an Event of Default. NCG is not responsible for any overdrafts or rejected transactions that may result from NCG's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between NCG and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

## THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.

**FOR THE MERCHANT (#1) By:**
RICARDO MARTINEZ LARA
Print Name and Title

DocuSigned by:
*Ricardo Martinez Lara*
5F69F574A5234DF...
Signature

**FOR THE MERCHANT (#2) By:**

Print Name and Title

Signature

**BY GUARANTOR(S) (#1) By:**
RICARDO MARTINEZ LARA
Print Name and Title

DocuSigned by:
*Ricardo Martinez Lara*
5F69F574A5234DF...
Signature

**BY GUARANTOR(S) (#2) By:**

Print Name and Title

Signature

Initial

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850

NewCo. CAPITAL GROUP

## MERCHANT AGREEMENT TERMS AND CONDITIONS

### 1    TERMS OF ENROLLMENT IN PROGRAM

**1.1    Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to NCG with a Bank acceptable to NCG to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to NCG with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide NCG and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes NCG and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to NCG for the receipts as specified herein and to pay such amounts to NCG. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by NCG or not. This additional authorization is not a waiver of NCG's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which NCG did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of NCG.

**1.2    Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by NCG as he terms of this Agreement.

**1.3    Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@NewCoCapitalGroup.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. NCG retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and NCG shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by NCG within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by NCG shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with NCG's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

**1.4    Adjustments to the Remittance.** As long as Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to NCG to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@NewCoCapitalGroup.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. NCG retains the right the request additional reasonable documentation including without limitation bank login or 3ʳᵈ party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and NCG shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide NCG with viewing access to their bank account as well as all information reasonably requested by NCG to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5    Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize NCG and its agents to investigate their financial responsibility and history, and will provide to NCG any authorizations, bank or financial statements, tax returns, etc., as NCG requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. NCG is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6    Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide NCG with Merchant's banking, brokerage and/

or processing history to determine qualification o r c ontinuation I n this program and for collections purposes. Merchant shall provide NCG with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from NCG.

**1.7    Indemnification.** Me r chant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless NCG and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnity as a direct or indirect result of (a) claims asserted by NCG for monies owed to NCG from Merchant and (b) actions taken by Indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by NCG.

**1.8    No Liability.** In no event will NCG be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s) s will be jointly liable for all of NCG's attorney's fees and expenses resulting therefrom.

**1.9    Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, NCG, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10    Sale of Receipts.** Merchant and NCG agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from NCG to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. NCG has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that NCG's share of Receipts collected are being held by Merchant in trust and are the sole property of NCG until they are remitted to NCG. Payments made to NCG in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to NCG full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. NCG hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of NCG for the purpose of collecting and delivering Receipts to NCG as required by this Agreement until NCG has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for the purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to NCG under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that NCG is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that NCG has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and NCG shall promptly refund to Merchant any interest received by NCG in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that NCG not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11    Power of Attorney.** Merchant irrevocably appoints NCG and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to NCG from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

Initial

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850

NewCo.
CAPITAL GROUP

invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to NCG; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which NCG may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection there with, all costs, expenses and fees, including legal fees, shall be payable by merchant.

**1.12 Protections against Default.** The following Protections 1 through 8 may be invoked by NCG immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the NCG electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to NCG; (c)Merchant changes the electronic check process or through which the Receipts are settled from Process or to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of NCG, and (ii) the written agreement of any NCG or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to NCG; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments. checks or deposits that are settled through Processor: (f) Merchant fails to provide NCG with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from NCG, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to NCG at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** NCG may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes NCG to execute in the name of the Merchant a Confession of Judgment in favor of NCG pursuant to the terms of the Confession of Judgment. Upon an Event of Default, NCG may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** NCG may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** NCG may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** NCG may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if NCG recovers a Judgment against Merchant, Merchant shall be liable for all of NCG's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to NCG. Upon breach of any provision in this Agreement, NCG may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. NCG may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to NCG.

**Protection 8.** NCG may debit Merchant's depository accounts wherever situated in such amounts as determined by NCG in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to NCG by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account or otherwise for all sums due to NCG.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of him self for herself personally, authorizes NCG to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that NCG obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each

Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against NCG or any of its affiliates relating to any (i)investigation undertaken by or on behalf of NCG as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by NCG, including this Agreement and any other NCG documents (collectively, "Confidential Information") are proprietary and confidential information of NCG. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of NCG to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles NCG to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s here to all hereby authorizes NCG to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that NCG may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between NCG and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## 2    REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to NCG, and future statements which will be furnished hereafter at the discretion of NCG, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise NCG of any material adverse change in their financial condition, operation or ownership. NCG may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to NCG within five business days after request from NCG. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without NCG's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and NCG, nor shall Merchant change any of its places of business without prior written consent by NCG.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from NCG to Merchant, execute, acknowledge and deliver to NCG and/or to any other person, firm or corporation specified by NCG, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion there of has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which NCG has been granted a security interest under the Security

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

4

Initial 

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850

NewCo.
CAPITAL GROUP

Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of NCG or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of NCG.

**2.11** Business Purpose. Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering in to this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12** Defaults under Other Contracts. Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13** Good Faith. Merchant and Guarantor(s) hereby affirm that Merchant is receiving the Purchase Price and selling NCG the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

## 3   EVENTS OF DEFAULT AND REMEDIES

**3.1** Events of Default. The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor(s) shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant or actively notifying NCG of its intent to breach this Agreement; (d) the Merchant fails to give NCG 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account; (e) Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by NCG, (f) Merchant shall voluntarily transfer or sell all or substantially all of its assets; (g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (h) Merchant shall use multiple depository accounts without the prior written consent of NCG or takes any other action that intentionally interferes with or prevents NCG from receiving the Purchased Amount in accordance with the terms of this Agreement; (i) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party. (j) Merchant shall change its depositing account without the prior written consent of NCG; or (k) Merchant shall close its depositing account used for ACH debits without the prior written consent of NCG (l) Merchant's bank returns a code other than NSF cutting NCG from its collections (m) Merchant or any Owner/ Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant; (n) Merchant shall default under any of the terms, covenants and conditions of any other agreement with NCG.

**3.2** Limited Personal Guaranty Upon the occurrence of an Event of Default, NCG will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will be jointly and severally liable to NCG for all of NCG's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3** Remedies. Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, NCG may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of NCG in connection with this Agreement may be exercised at any time by NCG after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4** Attorney's Fees. Upon the occurrence of an Event of Default, and NCG retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

**3.5** Costs. Merchant shall pay to NCG all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of NCG's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.6** Required Notifications. Merchant is required to give NCG written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give NCG seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## 4   MISCELLANEOUS

**4.1** Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by NCG.

**4.2** Assignment. NCG may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3** Notices. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to NCG shall become effective only upon receipt by NCG. Notices to Merchant shall become effective three days after mailing.

**4.4** Waiver Remedies. No failure on the part of NCG to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5** Binding Effect; Governing Law, Venue and Jurisdiction. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and NCG and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of NCG which consent may be withheld in NCG's sole discretion. NCG reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if NCG so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by NCG to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by NCG by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement,or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statue or rule of court, but without invalidating service performed in accordance with such other provisions.**

**4.6** Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7** Interpretation. All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8** Sever ability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforce ability of any other provision contained herein shall not in any way be affected or impaired.

**4.9** Entire Agreement. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty here to embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and NCG and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10** JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING

Initial

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850

NewCo.
CAPITAL GROUP

IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.12 Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

### SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name  MARTINEZ QUALITY PAINTING & DRYWALL INC

D/B/A:  MARTINEZ QUALITY PAINTING & DRYWALL    Federal ID#  81-5464716

Physical Address  8605 MULBERRY GROVE RD

City  CHARLOTTE          State  NC      Zip  28227

#### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to NCG and NCG's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements here in. Merchant and Guarantor(s) (s) grants to NCG a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) (s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to NCG under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to NCG upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover NCG's entitlements under this Agreement, NCG is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of NCG's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, NCG or an affiliate of NCG is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.
In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to NCG for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due NCG under the Revenue Purchase Agreement. With respect to any such entity, NCG shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC Financing Statement and to have it filed with any and all appropriate UCC filing offices. NCG shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such

Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. NCG shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of NCG's rights, including without limitation, NCG's right to collect all accounts, and to notify any payment card processor or creditor of such entity that NCG has such rights in such entity's assets. Merchant also agrees that, at the NCG's discretion, NCG may choose to amend any existing financing statement to include any such newly formed entity as debtor.
This security interest may be exercised by NCG without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. NCG shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, NCG has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, NCG will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from NCG written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and NCG is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by NCG. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to NCG such instruments and documents NCG may reasonably request to perfect and confirm the lien, security interest and right of set off set forth in this Agreement. NCG is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s)name.
Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to NCG under any other agreement between Merchant or Guarantor(s)(s) and NCG (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as NCG deems necessary to perfect or maintain NCG's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes NCG to file any financing statements deemed necessary by NCG to perfect or maintain NCG's security interest. Merchant and Guarantor(s)(s) shall be liable for, and NCG may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by NCG in protecting, preserving and enforcing NCG's security interest and rights.
**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.
**Consent to Enter Premises and Assign Lease.** NCG shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, NCG may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that NCG may enter into an agreement with Merchant's landlord giving NCG the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.
**Remedies.** Upon any Event of Default, NCG may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to NCG, whether by acceleration or otherwise.

### GUARANTY OF PERFORMANCE

As an additional inducement for NCG to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides NCG with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to NCG in the Event of Default. Guarantor(s) (s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

6

Initial _DS_ _jms_

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850

NewCo.
CAPITAL GROUP

**Guarantor(s) Waivers.** In the event of a breach of the above, NCG may seek recovery from Guarantor(s)s for all of NCG's losses and damages by enforcement of NCG's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral NCG may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in The Security Agreement and Guaranty herein. NCG is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) NCG's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to NCG. In addition, NCG may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to NCG; (ii) release Merchant from its obligations to NCG; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to NCG under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that NCG must return any amount paid by Merchant or any other Guarantor(s) of

the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

**Guarantor(s) Acknowledgment.** Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if NCG so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by NCG to transfer such proceeding to an Acceptable Forum.

The Merchant and Guarantor Acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their rights to Service of Porcess by traditional manners and will accept process of any Summons and Complaint or other legal process by certifies mail return receipt requested to the Mailing Address on Page 1 of the Agreement.

## MERCHANT(S)

**FOR ALL MERCHANT(S) (#1) By:**

RICARDO MARTINEZ LARA
Print Name and Title

·1779
SSN#

DocuSigned by:
*Ricardo Martinez Lara*
5F69F574A5234DF...
Signature

**FOR ALL MERCHANT(S) (#2) By:**

Print Name and Title

SSN#

Signature

## GUARANTOR(S)

**GUARANTOR(S) (#1) By:**

RICARDO MARTINEZ LARA
Print Name and Title

·1779
SSN#

DocuSigned by:
*Ricardo Martinez Lara*
5F69F574A5234DF...
Signature

**GUARANTOR(S) (#2) By:**

Print Name and Title

SSN#

Signature

Initial

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850





# APPENDIX A - THE FEE STRUCTURE:

A. Underwriting Fee $ 0.00    to cover the underwriting and related expenses.

B. Origination Fee $ 7,999.00    to cover the cost of Origination and ACH Setup.

C. NSF Fee (standard) $35.00 (each)

D. Rejected ACH/Blocked ACH/Default Fee $2,500.00 when Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our Debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

E Bank Change Fee $50.00 When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system

F. Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

**FOR THE MERCHANT (#1) By:**        **FOR ALL MERCHANT (#2) By:**

RICARDO MARTINEZ LARA

Print Name and Title              Print Name and Title

DocuSigned by:

*Ricardo Martinez Lara*

5F89F574A5234DF...

Signature                 Signature

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

Initial

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850



NewCo.
CAPITAL GROUP

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**Merchant:** MARTINEZ QUALITY PAINTING & DRYWALL INC
(Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement between NCG and Merchant, dated as of

November 4, 2021
(Month) (Day) (Year)

Designated Checking Account:

**Bank Name:** FIDELITY BANK                                   Branch:

**Tax ID:** 81-5464716

**ABA: Routing:** )3585                          **DDA: Account:** 4669

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes NCG to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes NCG to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of: $ 3,226.00          (Or) Percentage of each Banking Deposit:15 % On the Following Day(s):

☑ Monday      ☑ Tuesday      ☑ Wednesday      ☑ Thursday      ☑ Friday

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that NCG may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes NCG to initiate ACH entries to correct any erroneous payment transaction. Merchant also authorizes NCG or its affiliates and servicer to collect amounts due.

**MISCELLANEOUS.** NCG is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until NCG has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford NCG a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Merchant**                                              **Date**

MARTINEZ QUALITY PAINTING & DRYWALL INC                   November 4, 2021
(Merchant's Legal Name)                                   (Month) (Day) (Year)

**Owner**
Title

DocuSigned by:
_Ricardo Martinez Lara_

RICARDO MARTINEZ LARA                                     5F69F574A5234DF...
Print Name                                               (Signature)

Initial

DocuSign Envelope ID: A98168F8-3F23-4E82-96CD-2EC1A8126850





# BANK LOGIN INFORMATION

Dear Merchant,

Thank you for accepting this offer from NewCo Capital Group VI LLC. We look forward to being your funding partner for as long as you need.

Daily ACH Program:

Funder will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

## * Be sure to indicate capital or lower case letters.

**Name of Bank**

**Username**

**Bank portal website**

**Password**

**Security Question 1**

**Security Answer 1**

→

**Security Question 2**

**Security Answer 2**

→

**Security Question 3**

**Security Answer 3**

→

**Any other information necessary to access your account:**

**MERCHANT/OWNER NAME**

**Date**

RICARDO MARTINEZ LARA
      Print Name and Title

November 4, 2021
(Month) (Day) (Year)

Signature

NEWCO CAPITAL GROUP - REVENUE PURCHASE AGREEMENT

10

Initial

# DocuSign

## Certificado de finalización

Identificador del sobre: A98168F83F234E8296CD2EC1A8126850     Estado: Completado

Asunto: Funding Agreement NewCo Capital Group - MARTINEZ QUALITY PAINTING & DRYWALL INC - NC691523

Sobre de origen:

| | | |
|---|---|---|
| Páginas del documento: 10 | Firmas: 6 | Autor del sobre: |
| Páginas del certificado: 5 | Iniciales: 9 | Shirley Benjamin |
| Firma guiada: Activado | | 90 Broad, Suite 903 |
| Sello del identificador del sobre: Activado | | New York, NY  10004 |
| Zona horaria: (UTC-08:00) Hora del Pacífico (Estados Unidos y Canadá) | | Shirley@NewCoCapitalGroup.com |
| | | Dirección IP: 134.56.192.11 |

## Seguimiento de registro

Estado: Original     Titular: Shirley Benjamin     Ubicación: DocuSign
    04/11/2021 10:36:17     Shirley@NewCoCapitalGroup.com

| Eventos de firmante | Firma | Fecha y hora |
|---|---|---|
| Ricardo Martinez Lara | *[firma]* DocuSigned by: Ricardo Martinez Lara | Enviado: 04/11/2021 10:36:59 |
| Martinezqualitypaintndrywall@gmail.com | SF69F574A5234DF... | Visto: 04/11/2021 10:47:22 |
| Owner | | Firmado: 04/11/2021 10:48:04 |
| Nivel de seguridad: Correo electrónico, Autenticación de cuenta (ninguna) | Adopción de firma: Estilo preseleccionado Firmado a través del enlace enviado a Martinezqualitypaintndrywall@gmail.com Utilizando dirección IP           .9.248 Firmado con un dispositivo móvil | |

Información sobre confidencialidad de registros y firmas electrónicos:
Aceptado: 04/11/2021 10:47:22
ID: b04dc6                           ´87dfa

| Eventos de firmante en persona | Firma | Fecha y hora |
|---|---|---|

| Eventos de entrega al editor | Estado | Fecha y hora |
|---|---|---|

| Eventos de entrega al agente | Estado | Fecha y hora |
|---|---|---|

| Eventos de entrega al intermediario | Estado | Fecha y hora |
|---|---|---|

| Eventos de entrega certificada | Estado | Fecha y hora |
|---|---|---|

| Eventos de copia de carbón | Estado | Fecha y hora |
|---|---|---|
| shirley | **Copiado** | Enviado: 04/11/2021 10:36:59 |
| Shirley@newcocapitalgroup.com | | Reenviado: 04/11/2021 10:48:06 |
| ISO Rep | | Visto: 04/11/2021 10:48:30 |
| NewCo Capital Group | | |
| Nivel de seguridad: Correo electrónico, Autenticación de cuenta (ninguna) | | |

Información sobre confidencialidad de registros y firmas electrónicos:
No ofrecido a través de DocuSign

| Eventos del testigo | Firma | Fecha y hora |
|---|---|---|

| Eventos de notario | Firma | Fecha y hora |
|---|---|---|

| Eventos de resumen de sobre | Estado | Marcas de tiempo |
|---|---|---|
| Sobre enviado | Con hash/cifrado | 04/11/2021 10:37:00 |
| Certificado entregado | Seguridad comprobada | 04/11/2021 10:47:22 |

| Eventos de resumen de sobre | Estado | Marcas de tiempo |
|---|---|---|
| Firma completa | Seguridad comprobada | 04/11/2021 10:48:04 |
| Completado | Seguridad comprobada | 04/11/2021 10:48:04 |

| Eventos del pago | Estado | Marcas de tiempo |
|---|---|---|

**Información sobre confidencialidad de registros y firmas electrónicos**

Divulgación sobre los registros electrónicos y las firmas electrónicas creada el: 01/05/2020 19:26:57
Las partes acuerdan: Ricardo Martínez Lara

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, NewCo Capital Group LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact NewCo Capital Group LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: bruce@newcocapitalgroup.com

**To advise NewCo Capital Group LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at bruce@newcocapitalgroup.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from NewCo Capital Group LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to bruce@newcocapitalgroup.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with NewCo Capital Group LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to bruce@newcocapitalgroup.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify NewCo Capital Group LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by NewCo Capital Group LLC during the course of your relationship with NewCo Capital Group LLC.